*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PAULA DAY,

       Plaintiff-Appellee,

v

SUBURBAN MOBILITY AUTHORITY FOR
REGIONAL TRANSPORTATION,

       Defendant-Appellant,

and

GRADY RECHARDO PAGE and NATIONAL
INDUSTRIAL MAINTENANCE MICHIGAN INC,

       Defendants-Appellees,

and

TIMOTHY MICHAEL MARTIN and THE ASU
GROUP,

       Defendants.

UNPUBLISHED
October 13, 2022

No. 356848
Macomb Circuit Court
LC No. 2019-000199-NI

Before: RONAYNE KRAUSE, P.J., and JANSEN and SWARTZLE, JJ.

PER CURIAM.

       Defendant, the Suburban Mobility Authority for Regional Transportation (SMART) appeals by right the trial court's order denying SMART's motion for partial summary disposition regarding governmental immunity. Plaintiff, Paula Day, was injured while riding on a bus being driven by SMART's employee, defendant Timothy Michael Martin, when Martin drove the bus through a cloud of dust and into the rear end of a street sweeper being operated by defendant Grady Rechardo Page as an employee of defendant National Industrial Maintenance-Michigan, Inc (NIMM). The evidence in this matter most saliently consists of a video recording of the collision

captured by the bus's forward-facing camera. SMART generally contends that reasonable minds could not differ that Martin acted in a non-negligent manner, thereby precluding the only available exception to governmental immunity under the circumstances. Plaintiff argues that this Court lacks jurisdiction over this appeal. We reject both arguments, and we affirm.

## I. BACKGROUND

On June 7, 2018, at approximately 5:45 a.m., Day was riding as a passenger on a bus owned by SMART and being driven by SMART's employee, Martin, down 23 Mile Road in Chesterfield Township. Also on the road was a street sweeper owned by NIMM and being driven by NIMM's employee, Page, and at least two other street sweepers. The bus rear-ended the street sweeper, causing injuries to Martin, Day, and the one other passenger; Page was uninjured. As will be discussed further below, the bus was equipped with a surveillance camera and a GPS system that recorded the accident from the bus's vantage point. Martin died during the pendency of this action, apparently for reasons unrelated to the accident, but before his death, he filled out an internal report for SMART[1] in which he provided the following narrative:

> While traveling east on 23 Mile enroute to New Baltimore I suddenly encountered a cloud of dust of [*sic*, or?] fog that completely eliminated my ability to see the road ahead. I immediately hit my brakes but was not able to stop the coach in enough time to avoid collision with a street sweeper that I [illegible] couldn't see in the cloud of fog. Imediately [*sic*] after the accident I checked on the passengers on board and the [*sic*] called Central dispatch to request medical attention for myself and the remaining passengers.

The police officer who filled out the traffic crash report indicated that Martin and Page had both engaged in "hazardous action." The officer opined that Martin had failed to ensure that he had a safe distance to stop; he opined that Page had "creat[ed] a large cloud of dust with no visible warning signals on the vehicle due to the large amount of dust." Day testified that she had no recollection of the accident itself. However, she testified that she had been taking the same bus to work six days a week for four years, and she recognized Martin as a regular driver of that route.

SMART conducted an internal investigation and determined that the accident was "non-preventable." SMART's position, stated generally, was that Page operated the street sweeper improperly, causing it to generate a large cloud of dust. SMART concluded that, because there was little ambient light that early in the morning, the dust cloud not only obscured the street sweeper from Martin's view, but the dust cloud itself was also invisible until it was too late to avoid the collision. SMART drew its conclusions based primarily on reviewing the video taken by the bus's camera. SMART recognized that the bus was traveling at 49 mph at the time of the collision, which was above the posted speed limit of 45 mph, but emphasized that the bus had just passed through an intersection at which the speed limit dropped from 50 mph. SMART

---

[1] The parties dispute the admissibility of this report. We have chosen to consider it for purposes of resolving this appeal, but we expressly do not decide whether it would be admissible at trial.

emphasizes that the bus's camera artificially enhances illumination, so everything depicted in the video was, in reality, much dimmer than the video would suggest.[2]

NIMM explained that operation of its street sweepers required the use of water to control dust. NIMM took the position that the cloud of dust should not have been generated, but emphasized that the amount of dirt at any particular location on a road was unpredictable, and NIMM had never cleaned that particular road before. NIMM conceded that another of its employees had improperly failed to equip the sweeper with an "attenuator," which is a separate truck that would follow about 200 feet behind the sweeper and would absorb some impact energy in the event of a rear-end collision. Nevertheless, the attenuator would not have prevented the accident, and the bus driver should not have driven through the cloud of dust. NIMM pointed out that its street sweepers were equipped with more amber flashing lights than were required.

We have carefully reviewed the video recordings provided to us. Although some aspects of the video are ambiguous, others are not. It is plainly apparent that the illumination has been artificially increased, as SMART argues. Nevertheless, it is also plainly apparent that a human eye would have dramatically better acuity. For example, no license plates can be read in the video and almost no signage alongside the road can be read; no human with eyesight as poor as the video camera should be on the road. Humans also have stereoscopic vision allowing for depth perception, the low resolution of the video artificially restricts how far ahead of the bus any objects can be discerned, and human eyes are highly sensitive to movement. Therefore, although the video footage is brighter than what a human eye would have seen, it simultaneously offers significantly less detail than what a human eye would have seen. We think that whether the video provides, *on balance*, a fair approximation of what would or would not have been visible to Martin is clearly a question of fact by itself.

From what can be seen in the video, we agree with the trial court and the parties that flashing lights from Page's street sweeper are apparent long before the sweeper disappeared into the cloud of dust. Indeed, the dimmed video provided by SMART to be more representative of what a human eye would have seen actually makes it *more* apparent that the bus is following a vehicle with flashing lights long before the bus reaches the cloud. The video does not allow us to say with confidence exactly how long the flashing lights were visible. Furthermore, the dust cloud is apparent well before the collision, and it appears that some other vehicles traveling parallel to the bus braked or swerved to avoid the cloud. According to telemetry data recorded by the bus, Martin accelerated toward the intersection where the speed limit dropped from 50 mph to 45 mph, and the collision occurred just beyond that intersection. The telemetry data indicates that the bus's brakes were applied two seconds before impact.

Day commenced this action against, in relevant part, Martin, Page, SMART, and NIMM. Relevant to this appeal, on August 31, 2020, SMART moved for partial summary disposition under

---

[2] SMART proffered expert evidence to this effect for the first time in a reply brief, so we need not consider it. However, it is readily apparent from observing the way in which light sources, including oncoming headlights and commercial signage, wash out and cast illumination in the video that the footage has been artificially brightened.

MCR 2.116(C)(7) (claims barred by governmental immunity[3]), MCR 2.116(C)(8) (failure to state a claim upon which relief can be granted), and MCR 2.116(C)(10) (no genuine issue of material fact). SMART generally argued that although the rear-end collision would ordinarily give rise to a presumption of negligence, reasonable minds could not differ that the accident was a result of a sudden emergency not of Martin's making that made the accident unavoidable. As noted, much of the evidence in this matter consists of the video recording from the bus. The trial court found a question of fact whether Martin had been negligent.

## II. JURISDICTION

As an initial matter, plaintiff argues that this Court lacks jurisdiction over this appeal. We disagree.

Pursuant to MCR 7.202(6)(a)(*v*), an appealable "final judgment" or "final order" includes

> an order denying governmental immunity to a governmental party, including a governmental agency, official, or employee under MCR 2.116(C)(7) or an order denying a motion for summary disposition under MCR 2.116(C)(10) based on a claim of governmental immunity.

This Court's jurisdiction over an appeal of right from such an order "is limited to the portion of the order with respect to which there is an appeal of right." MCR 7.203(A)(1)(b). Plaintiff argues that this Court's jurisdiction is therefore limited to determining whether plaintiff pleaded a claim in avoidance of governmental immunity, not whether SMART may be liable for negligence.

We disagree. A motion for summary disposition under MCR 2.116(C)(10) inquires into whether there is a question of fact for the jury, not whether a plaintiff adequately pled a claim. If this Court were not permitted to consider whether a claim in avoidance of governmental immunity could be factually supported, much of MCR 7.202(6)(a)(*v*) would be an effective nullity. This Court held similarly in *Seldon v SMART*, 297 Mich App 427, 436; 824 NW2d 318 (2012). The only rational reading of MCR 7.203(A)(1)(b) is that it precludes interlocutory appellate review of a portion of a trial court's order that disposed of issues other than governmental immunity.

Plaintiff argues that *Seldon* conflicts with authority from our Supreme Court. Plaintiff misunderstands the cases she cites, none of which offer any meaningful discussion of the motor vehicle exception to governmental immunity. We agree with plaintiff that the cases do suggest a general rule that pleading in avoidance of governmental immunity is a distinct "step" from proving a cause of action sounding in negligence. *Suttles v Dep't of Transportation*, 457 Mich 635, 651 n 10; 578 NW2d 295 (1998); *Nawrocki v Macomb Co Road Comm*, 463 Mich 143, 172 n 29; 615 NW2d 702 (2000); *Haliw v Sterling Heights*, 464 Mich 297, 304-305; 627 NW2d 581 (2001); *Robinson v City of Lansing*, 486 Mich 1, 20; 782 NW2d 171 (2010). This, however, misses the point: proving negligence is an intrinsic part of proving an exception to governmental immunity under the motor vehicle exception. It should not be surprising that avoiding governmental

---

[3] There is no serious dispute that SMART is a governmental agency.

-4-

immunity requires both proper pleading and proper evidence, and a two-step process does not mean the second step is not a part of the process.

## III. STANDARD OF REVIEW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. Under MCR 2.116(C)(7), where the claim is allegedly barred, the trial court must accept as true the contents of the complaint, unless they are contradicted by documentary evidence submitted by the moving party. *Id*. at 119. This Court also reviews de novo the applicability of governmental immunity and the interpretation and application of statutes. *Wood v City of Detroit*, 323 Mich App 416, 419; 917 NW2d 709 (2018).

## IV. QUESTION OF FACT REGARDING NEGLIGENCE

There is no serious dispute that SMART is a governmental entity, that SMART owned the bus, that the bus was a motor vehicle, or that Martin was SMART's employee. There is also no serious dispute that Martin was "operating" the bus within the meaning of MCL 691.1405. See *Chandler v Co of Muskegon*, 467 Mich 315, 319-320; 652 NW2d 224 (2002). As SMART properly conceded in the trial court, plaintiff adequately pled a claim in avoidance of governmental immunity pursuant to MCL 691.1405, the "motor vehicle exception," which provides, in part:

> Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner . . .

Therefore, at issue is mostly whether Martin operated the bus negligently.

Negligence requires a plaintiff to show that a defendant owed the plaintiff a duty, that the defendant breached the duty, and that the breach of the duty caused the plaintiff's injuries. *Henry v Dow Chemical*, 473 Mich 63, 71-72; 710 NW2d 684 (2005). The "duty" generally means that a defendant must exercise reasonable care under the circumstances, which is ordinarily a question for the jury unless reasonable minds could not differ or there is an applicable overriding legislative or judicial policy. *Case v Consumers Power Co*, 463 Mich 1, 6-7; 615 NW2d 17 (2000). Ordinarily, only the trier of fact may resolve conflicts in evidence. *Nichol v Billot*, 406 Mich 284, 301-302; 279 NW2d 761 (1979). Objective and clear record evidence, such as a video recording, that "blatantly" contradicts a party's differing version of events may discredit that version of events so utterly that no reasonable jury could believe it, thereby precluding a court from finding a genuine question of material fact. See *Scott v Harris*, 550 US 372, 378-381; 127 S Ct 1769; 167 L Ed 2d 686 (2007). However, although the primary evidence in this matter is indeed a video recording, the parties dispute what can be gleaned from that video recording.

Drivers who have the right-of-way are not necessarily required to be *always* able to avoid a collision with another vehicle that is illegally in the driver's path, but drivers must nevertheless remain alert to impending dangers and act reasonably to avoid collisions when the danger becomes apparent. *McGuire v Rabaut*, 354 Mich 230, 234-236; 92 NW2d 299 (1958). Pursuant to MCL 257.402(a), the driver of a vehicle that rear-ends another vehicle "shall be deemed prima facie guilty of negligence." Pursuant to MCL 257.627(1), drivers must "not operate a vehicle upon a highway at a speed greater than that which will permit a stop within the assured, clear distance ahead." The presumption of negligence under the rear-end collision statute is rebuttable. *Vander Laan v Miedema*, 385 Mich 226, 231; 188 NW2d 564 (1971). "However, a violation of the assured-clear-distance statute constitutes negligence per se," although the statute is not always applicable and, in relevant part, will not apply "when a collision is shown to have occurred as the result of a sudden emergency not of the defendants' own making." *Id*.

Much of the substantive argument in this appeal concerns the applicability of the "sudden emergency doctrine." Our Supreme Court approved the following description:

> The emergency doctrine in law means that a person who is operating a motor vehicle and suddenly is faced with an unusual or unsuspected situation is required to act as a reasonably prudent man would or might act under the same or similar circumstances; that is act as a reasonably prudent man would under like circumstances, however, if this emergency is brought about by his own carelessness and recklessness or negligent acts, then the emergency doctrine itself, of course, does not apply. [*Barringer v Arnold*, 358 Mich 549, 599; 101 NW2d 365 (1960).

Our Supreme Court further illustrated:

> The term "unusual" is employed here in the sense that the factual background of the case varies from the everyday traffic routine confronting the motorist. Such an event is typically associated with a phenomenon of nature. A classical example of the "unusual" predicament envisioned by the emergency doctrine is provided by *Patzer v Bowerman-Halifax Funeral Home*, [370 Mich 350; 121 NW2d 843 (1963)], wherein the accident occurred amid an Upper Peninsula blizzard.

> "Unsuspected" on the other hand connotes a potential peril within the everyday movement of traffic. To come within the narrow confines of the emergency doctrine as "unsuspected" it is essential that the potential peril had not been in clearview [*sic*] for any significant length of time, and was totally unexpected. A good example of this can be seen in *McKinney v Anderson*, [373 Mich 414; 129 NW2d 851 (1964)], where defendant rear-ended a plaintiff's car which had stopped while pushing a disabled vehicle on the highway. Coming over the crest of a hill, defendant first saw plaintiff's taillights when he was 400 feet away. However, defendant did not clearly see the peril of plaintiff's stopping until he was about 100-200 feet away, at which point it was too late to avoid a collision under the circumstances. Furthermore, the failure of the plaintiff to signal that he was stopping, coupled with the surrounding darkness, made the subsequent peril totally unexpected to the defendant.

> The record in the instant case reveals that the accident occurred during daylight hours on a dry, paved highway, thereby precluding the possibility that the surrounding circumstances made the situation "unusual." . . . This whole scene continued to be in actual view at all times except for a "second or so" when [the defendant] glanced in his rearview mirror after hitting a bump in the road. While the process of looking in the rear-view mirror may have interrupted [the defendant's] actual view of the scene, he is still held to have had clear view. [*Vander Laan*, 385 Mich at 232-233.]

Ultimately, "the doctrine of 'sudden emergency' is nothing but a logical extension of the 'reasonably prudent person' rule." *Baker v Alt*, 374 Mich 492, 496; 132 NW2d 614 (1965).

Pursuant to *Vander Laan*, "unusual" circumstances for purposes of the sudden emergency doctrine pertain to driving conditions. In *Patzer*, our Supreme Court discussed winter driving conditions in the Upper Peninsula, where snow blowing across exposed areas of roads may reduce visibility yet compel drivers to proceed despite the danger, lest they be rear-ended by other drivers; thus, "it isn't possible at all times to obey the letter of the enactment requiring an assured clear distance ahead, and still obey the variable and jury-determinable requirement of due care." *Patzer*, 370 Mich at 354-355. In that case, an ambulance responding to an emergency proceeded, at reduced speed, through an exposed, snow-obscured part of the road and crashed into the plaintiff's stopped vehicle. *Id*. at 356. Our Supreme Court concluded that the ambulance driver was presumptively negligent, but there was nevertheless a question for the jury whether the presumption had been overcome. *Id*. at 357-358. Presuming the cloud of dust in this case could constitute the kind of "unusual" driving conditions to which the sudden emergency doctrine might apply, it is noteworthy that the dust cloud was plainly visible well before the bus drove into the cloud, and Martin made no effort to slow the bus. In contrast, the ambulance driver in *Patzer* did slow down (and, implicitly, had a grave need to face the hazard). Whether Martin could see the street sweeper through the cloud is irrelevant to this analysis: if he drove at full speed (or even accelerated) into the low-visibility driving conditions despite being able to see the cloud itself, any "sudden emergency" was of his own making.[4] Therefore, the sudden emergency doctrine would not apply.

An "unsuspected" peril, in contrast, refers to some invisible and unexpected occurrence in the roadway rather than general driving conditions. *Vander Laan*, 385 Mich at 232. In *McKinney*, the plaintiff was pushing a disabled vehicle with his own car at about 7:30 p.m. on October 8, 1960,[5] down Woodward Avenue in Detroit, when the defendant crested a hill and failed to notice that the plaintiff was driving slowly until the defendant was only 50 to 100 feet away, at which time the defendant applied his brakes. *McKinney*, 373 Mich at 417-418. The defendant was driving 45 MPH in a 50 MPH zone, but by his own admission he was driving too fast to stop within 100 feet. *Id*. at 418. Our Supreme Court recognized that the defendant was presumptively

---

[4] Furthermore, a reasonable person should deduce that a sudden cloud of dust on a road was probably generated by something concealed within the cloud of dust. See *Goss v Overton*, 266 Mich 62, 64; 253 NW2d 217 (1934).

[5] Although not expressly stated in the opinion, it was likely dark out at that time.

negligent because he caused a rear-end collision, and he committed negligence per se by violating the assured-clear-distance statute, but it found a jury question whether the sudden emergency doctrine overcame the presumption. *Id*. at 419. It noted that the evidence, in the light most favorable to the defendant, showed that the plaintiff's car had stopped without any signaling, the defendant could not have maneuvered around the plaintiff's car, and that the defendant was driving within the posted speed limit. *Id*.

We do not think the dispositive inquiry in this matter is whether the street sweeper was expected. Rather, the dispositive inquiry is whether either the sweeper or the cloud was visible, an inquiry that does not turn on whether the driver was actually looking at it. *Vander Laan*, 385 Mich at 233. Presuming the sweeper or the dust cloud were unexpected, the video evidence again shows that the cloud was visible well before Martin made any effort to slow the bus. Furthermore, several flashes of the street sweeper's strobe light are visible through the cloud before Martin makes any effort to apply the brakes. Finally, the parties dispute whether the sweeper's flashing lights are visible in the lane ahead almost half a minute before the collision, but the video, especially the darkened video, strongly suggests they were. By implication, Martin should have been aware that he was following a vehicle with flashing lights before it disappeared into the cloud. In any event, if it was too dark to see, then Martin's failure to reduce his speed would also be evidence of negligence rather than helplessness. See *People v Campbell*, 237 Mich 424, 440-441; 212 NW 97 (1927). Finally, the evidence shows that Martin was familiar with the route and would have been aware of the impending speed limit reduction, and speed limit signs demark the point at which the speed limit itself changes, not the point at which a driver should begin decelerating. See *People v Ray*, 2 Mich App 623, 628; 141 NW2d 320 (1966).

As noted, the sudden emergency doctrine is little more than a refined application of the reasonable prudent person standard. Ultimately, if either the cloud or the sweeper was visible, then there is at least a question of fact for the jury whether Martin was negligent. More importantly, there can be no dispute that several presumptions of negligence apply, and the jury *must* consider whether those presumptions were overcome unless "at the very least" there is "clear, positive, and credible evidence opposing the presumption." *White v Taylor Distributing Co, Inc*, 275 Mich App 615, 621-622; 739 NW2d 132 (2007), aff'd 482 Mich 136 (2008). SMART has provided no such evidence.[6] To the extent the video recording is ambiguous, its interpretation is a question for the trier of fact. To the extent the video recording is clear, it supports an inference that Martin was negligent.

SMART further argues that even if Martin did operate the bus negligently, any such negligence was not the cause of plaintiff's injuries. This is essentially an argument relying on NIMM's employees operating the street sweeper improperly. There is indeed some evidence in the record to the effect that the sweeper might have been operated improperly. However, presuming the street sweeper was being operated negligently, that would not necessarily do more than make NIMM a potential joint tortfeasor. It would not inherently mean SMART's negligence did not cause plaintiff's injuries. SMART has provided, at the most, plausible evidence that

---

[6] It would be outside the scope of this appeal to address whether SMART has introduced adequate evidence to permit it to argue the existence of a "sudden emergency" to the jury.

another tortfeasor's negligence may have contributed to plaintiff's injuries. Nevertheless, the evidence clearly shows a question of fact whether plaintiff's injuries "resulted from" Martin's negligence.

Affirmed. In consideration of our rejection of plaintiff's jurisdictional argument, we direct that the parties shall bear their own costs on appeal. MCR 7.219(A).

/s/ Amy Ronayne Krause
/s/ Kathleen Jansen
/s/ Brock A. Swartzle